IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 3, 2024 Session

## REBECCA HUDSON ET AL. v. PAUL GRAVETTE ET AL.

**Appeal from the Circuit Court for Hickman County**
**No. 20-CV-3      Michael E. Spitzer, Judge**

_____

### No. M2022-01787-COA-R3-CV

_____

A kennel technician filed a personal injury action against the owners of two dogs, asserting a claim under the statute governing dog owners' liability for injuries caused by their dogs and a claim for common law negligence. The technician alleged that the dogs attacked and injured her while they were boarded at her place of employment. The trial court granted summary judgment to the dog owners on both claims. We affirm the trial court's decision to grant summary judgment on the statutory claim, but we reverse the court's decision to grant summary judgment on the common law negligence claim.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER and JEFFREY USMAN, JJ., joined.

Brian Patrick Dunigan, Goodlettsville, Tennessee, for the appellant, Rebecca Hudson.

Christopher M. Jones, Brentwood, Tennessee, and Richard J. Montes, Woodbury, New York, for the appellees, Paul Gravette and Leigh Ann Gravette.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Paul and Leigh Ann Gravette own two English bulldogs, Winston and Duke. The Gravettes frequently travel for business, which necessitates placing Winston and Duke in a boarding facility. For some time, the Gravettes boarded the dogs at Belmont Pet Resort, but in March 2018, the dogs allegedly bit one of the facility's employees and scratched another. Susan Lonardelli, the general manager of Belmont Pet Resort, submitted an affidavit stating that she informed the Gravettes of these attacks and told them that the dogs

could not be boarded at that facility in the future. The Gravettes then began boarding Winston and Duke at Chasing Tails Pet Farm ("Chasing Tails"). Between May 2018 and February 2019, the dogs stayed at Chasing Tails for 134 days.

Chasing Tails is owned by Jeff Patton and provides numerous services for dogs including daycare, boarding, exercising, training, feeding, administering medications, grooming, and transportation. When Winston and Duke stayed at Chasing Tails, someone from the facility would pick the dogs up from the Gravettes' home and take them to the facility. While the dogs were at Chasing Tails, the facility was responsible for their feeding schedule and ensuring they were exercised. If Winston and Duke needed to go to the veterinarian during their stay at the facility, a Chasing Tails employee would take them. At the end of their stay, someone from the facility would bathe the dogs and drive them back to the Gravettes' home.

Rebecca Hudson worked at Chasing Tails as a dog trainer and kennel technician. Her job duties included caring for the dogs, feeding them, bathing them, exercising them, administering their medications, and taking pictures for Chasing Tails's Instagram account. On the morning of March 2, 2019, Winston and Duke were being boarded at Chasing Tails. Ms. Hudson was the first to arrive at the facility, and she began taking dogs outside to relieve themselves. Her routine consisted of letting a few dogs out at a time, and Winston and Duke were in the last group to be let outside. As Ms. Hudson released Winston and Duke from their crates, one of the dogs (she does not know which one) began nipping her feet and bit through her shoe, puncturing her right foot. According to Ms. Hudson, she fell to the ground, and both dogs proceeded to attack her for approximately five to ten minutes—ending only when another dog intervened to pin down either Winston or Duke. She was then able to return the dogs to their crates.

Ms. Hudson filed a complaint against the Gravettes on January 3, 2020, asserting a claim for common law negligence and a claim for strict liability under Tenn. Code Ann. § 44-8-413, Tennessee's dog bite statute. She claimed that, during the attack, she sustained "countless bite wounds to her arms, legs, and other parts of her body" that required her "to undergo emergency surgery," that she is now covered in scars, and that she continues to suffer from "incredibly painful" nerve damage, swelling in her feet, and debilitating post-traumatic stress. The Gravettes filed an answer asserting comparative fault against Mr. Patton, d/b/a Chasing Tails Pet Farm. Ms. Hudson amended her complaint to add Mr. Patton as a defendant pursuant to Tenn. Code Ann. § 20-1-119. Mr. Patton filed a motion to be dismissed from the case because he was Ms. Hudson's employer and, therefore, was immune from liability pursuant to the "exclusive remedy rule" of the Tennessee Workers' Compensation Act. The trial court granted Mr. Patton's request on July 27, 2020. Shortly before Mr. Patton's dismissal from the case, Trumbull Insurance Company moved to intervene as a plaintiff to protect its subrogation interest for workers' compensation benefits paid to Ms. Hudson. The trial court granted the motion to intervene.

After the parties engaged in discovery, the Gravettes filed a motion for summary judgment on November 15, 2021, and a supplemental motion for summary judgment on April 1, 2022. The Gravettes argued that they were entitled to summary judgment because Tenn. Code Ann. § 44-8-413 abrogated common law claims related to dog bite incidents and that Ms. Hudson could not recover under Tenn. Code Ann. § 44-8-413 because Chasing Tails fell within the statute's definition of "owner."

The trial court denied the motion because it found that the record was insufficient to establish whether Chasing Tails owned the dogs under the statute. After engaging in additional discovery, the Gravettes renewed their motion for summary judgment, attaching evidence related to the ownership issue. In particular, they submitted invoices from Chasing Tails and Mr. Patton's deposition testimony to support their argument that Chasing Tails had exclusive control of the dogs at the time of the incident and that Chasing Tails regularly exercised control over the dogs. Based on this additional evidence, the trial court granted the Gravettes' renewed motion for summary judgment on December 5, 2022. The court held that Chasing Tails fell within the statute's definition of "owner" because it kept Winston and Duke "almost half of a nine-month period" and because keeping them was for Chasing Tails's benefit. The court further held that Ms. Hudson could not recover from the Gravettes under the statute because Chasing Tails was the owner who failed to keep the dogs under reasonable control. The court concluded that the statute controlled under the facts of the case and, therefore, abrogated Ms. Hudson's common law negligence claim.

Ms. Hudson appealed and presents the following issue for our review: whether the trial court erred "in granting summary judgment based on a finding that the Gravettes, who knowingly owned vicious dogs, could not be held liable[, under statutory law or the common law,] to an employee of a boarding facility which regularly kept the dogs because the boarding facility was a 'statutory owner.'"

STANDARD OF REVIEW

We review a trial court's summary judgment determination de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). This means that "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* We "must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor." *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *see also Acute Care Holdings, LLC v. Houston Cnty.*, No. M2018-01534-COA-R3-CV, 2019 WL 2337434, at *4 (Tenn. Ct. App. June 3, 2019).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. A disputed fact is material if it is determinative

of the claim or defense at issue in the motion. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)). When a party moves for summary judgment but does not have the burden of proof at trial, the moving party must submit evidence either "affirmatively negating an essential element of the nonmoving party's claim" or "demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264. Once the moving party has satisfied this requirement, the nonmoving party "'may not rest upon the mere allegations or denials of [its] pleading.'" *Id.* at 265 (quoting TENN. R. CIV. P. 56.06). Rather, the nonmoving party must respond and produce affidavits, depositions, responses to interrogatories, or other discovery that "set forth specific facts showing that there is a genuine issue for trial." TENN. R. CIV. P. 56.06; *see also Rye*, 477 S.W.3d at 265. If the nonmoving party fails to respond in this way, "summary judgment, if appropriate, shall be entered against the [nonmoving] party." TENN. R. CIV. P. 56.06. If the moving party fails to show he or she is entitled to summary judgment, however, "'the non-movant's burden to produce either supporting affidavits or discovery materials is not triggered and the motion for summary judgment fails.'" *Martin*, 271 S.W.3d at 83 (quoting *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)).

Determining whether summary judgment was appropriate in this case requires us to interpret Tenn. Code Ann. § 44-8-413. When interpreting a statute, our role "is to assign a statute the full effect of the legislative intent without restricting or expanding its intended scope." *Frazier v. State*, 495 S.W.3d 246, 248 (Tenn. 2016). We determine the legislature's intent by "look[ing] first and foremost to the text of the statute because the statutory language is of primary importance." *Flade v. City of Shelbyville*, 699 S.W.3d 272, 285 (Tenn. 2024). If a statute's language is "clear and unambiguous, we derive the legislative intent from the plain meaning of the statutory language and simply enforce the statute as written." *Id.* Statutory construction presents a question of law that we review de novo without a presumption of correctness. *State v. Welch*, 595 S.W.3d 615, 621 (Tenn. 2020).

ANALYSIS

I.      Whether Chasing Tails was a statutory owner of the dogs

We begin with Ms. Hudson's argument that the trial court erred in concluding that Chasing Tails was an "owner" of the dogs under Tenn. Code Ann. § 44-8-413. That statute provides, in pertinent part, as follows:

> The owner of a dog has a duty to keep that dog under reasonable control at all times, and to keep that dog from running at large. A person who breaches that duty is subject to civil liability for any damages suffered by a person who is injured by the dog while in a public place or lawfully in or on the private property of another.

Tenn. Code Ann. § 44-8-413(a)(1). Thus, under this statute, a dog owner is "strictly liable if the owner's dog injures a person because the owner failed to exercise reasonable control over the dog or the dog is running at large." *Searcy v. Axley*, No. W2017-00374-COA-R3-CV, 2017 WL 4743111, at *4 (Tenn. Ct. App. Oct. 19, 2017).

When read in its entirety, the thrust of the statute is to encourage dog owners to control their dogs in order to protect the public from harm. The question then is who constitutes an "owner" of a dog with a duty to keep that dog under reasonable control. The statute defines an "owner" as

> a person who, at the time of the damage caused to another, regularly harbors, keeps, or exercises control over the dog, but does not include a person who, at the time of the damage, is temporarily harboring, keeping, or exercising control over the dog.

*Id.* § 44-8-413(e)(1). We have previously interpreted this definition and held that it "should be evident" from the statutory language that "the General Assembly did not delimit the meaning of 'owner' to the common connotation of a dog owner, i.e., one with a property interest in the dog. The statutory understanding of 'owner' is broader, implicating persons who regularly harbor, keep, or exercise control over the dog." *Folad v. Quillco, LLC*, 629 S.W.3d 134, 139 (Tenn. Ct. App. 2021). In other words, the statute expanded the meaning of an "owner" of a dog beyond a dog's legal owner to include anyone who regularly places himself or herself in a position of control akin to that of a legal owner.

Ms. Hudson contends that the trial court should not have found that Chasing Tails fell within the statute's expanded definition of an "owner" of the dogs because nothing in the record shows that it was "harboring or keeping the dogs on a permanent basis." Reading the definition of "owner" reveals no language stating that a person must permanently harbor or keep a dog to constitute an "owner" of the dog. Rather, the statute states that a person must "*regularly* harbor[], keep[], or exercise[] control over the dog" to be considered an owner of a dog. Tenn. Code Ann. § 44-8-413(e)(1) (emphasis added). The statute does not define the term "regularly." Thus, our task is to ascertain whether the legislature intended for the term "regularly" to mean "on a permanent basis" by looking at the natural and ordinary meaning of the statute's words. *Flade*, 699 S.W.3d at 285.

Courts often turn to dictionaries to determine the natural and ordinary meaning of the words in a statute. *English Mtn. Spring Water Co. v. Chumley*, 196 S.W.3d 144, 148 (Tenn. Ct. App. 2005). *Merriam-Webster Dictionary* defines "regularly" as: (1) "in a regular manner"; or (2) "on a regular basis: regular intervals." *Regularly*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/regularly (last visited Apr. 22, 2025). Similarly, *Cambridge Dictionary* defines "regularly" as: (1) "often"; or (2) "at repeated times, with equal or similar amounts of time between one time

and the next." *Regularly*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/regularly (last visited Apr. 22, 2025). We, therefore, conclude that the natural and ordinary meaning of the term "regularly" shows that the legislature intended for an "owner" of a dog to be a person who often or on a regular basis "harbors, keeps, or exercises control over the dog." Tenn. Code Ann. § 44-8-413(e)(1). Thus, contrary to Ms. Hudson's assertion, Chasing Tails did not have to harbor or keep the dogs permanently to constitute an owner of the dogs.

In addition to the foregoing, we note that, because Chasing Tails is a business, the principles set forth in *Folad v. Quillco, LLC* also apply. *Folad* involved two dogs that their legal owner kept at the legal owner's store, which was operated by Quillco, LLC. 629 S.W.3d at 136. The plaintiff sued the dogs' legal owner and Quillco, LLC under Tenn. Code Ann. § 44-8-413, alleging that she was injured by the dogs when they escaped from the store. *Id.* After the dogs' legal owner was dismissed from the case, Quillco, LLC filed a motion for summary judgment, arguing that it did not fall within the statutory definition of an "owner" of the dogs because, at best, it merely had temporary custody or control of the dogs. *Id.* at 137. The trial court agreed and granted summary judgment to Quillco, LLC because it concluded that, at the time of the incident, the dogs were at the store with their legal owner and, at all relevant times, the dogs were under the legal owners' care, custody, and control. *Id.*

On appeal, this Court reversed after determining that there was a genuine issue of material fact regarding whether Quillco, LLC's relationship with the dogs placed it within the meaning of an "owner" of the dogs under the statute. *Id.* at 140. In making its determination, the *Folad* court noted that it was undisputed that the dogs "had a regular presence" in the store and that the store's employees had been instructed to lock the store's back door when the dogs were in the store, but the court held that "a business entity should [not] be considered a regular harborer, keeper, or controller of a dog within the meaning of the statute solely by dint of a dog's presence at the business." *Id.* Rather, the court stated, "whether status as harborer, keeper, or controller can attach to a business entity is entirely dependent on the purpose of a dog's presence at the business," with importance placed on whether the dog's presence would benefit or further the entity's business. *Id.* Because there was evidence that the dogs were used in marketing the store and that they were regularly in the store to "enhance the customer experience," the court concluded that there was a dispute of material fact regarding whether Quillco, LLC was an "owner" under the statute because the business benefitted from the dogs' presence at the store. *Id.* at 141.

Applying the foregoing reasoning to the present case, we conclude that the evidence in the record supports the trial court's determination that Chasing Tails regularly harbored, kept, and exercised control over the dogs. It is undisputed that the Gravettes traveled extensively for work and frequently boarded Winston and Duke at Chasing Tails from May 8, 2018, through May 2, 2019. During that time period, the Gravettes boarded the dogs at Chasing Tails every month for stays that ranged from five to sixteen days each time.

Indeed, the record contains fifteen invoices from Chasing Tails showing that, from May 2018 through February 2019, the dogs stayed at Chasing Tails 134 days out of the total 287 days—nearly fifty percent of the time. Further, at the time of the alleged attack on Ms. Hudson, the dogs had already been at Chasing Tails for several days. The evidence, therefore, establishes that, at the time of the alleged attack, Winston and Duke had been staying at Chasing Tails on a regular basis. The evidence also shows that, during each stay, Chasing Tails had exclusive custody and control of the dogs that was akin to that of their legal owners. Specifically, during each stay, Chasing Tails lodged, trained, fed, and provided all necessary care for the dogs, including grooming them and taking them to veterinary appointments. Furthermore, when each stay ended, Chasing Tails, not the Gravettes, would transport the dogs back to the Gravettes' home.

Regarding the benefit element, Ms. Hudson contends that the Gravettes, not Chasing Tails, benefitted from the dogs' presence at Chasing Tails because the Gravettes boarded the dogs at Chasing Tails to be cared for and socialized while they traveled. We respectfully disagree. This is not a situation where Winston and Duke were at Chasing Tails because Chasing Tails kindly opened its doors to them as a favor or goodwill gesture for the convenience of the Gravettes. The dogs had a regular presence at Chasing Tails because Chasing Tails is in the business of boarding and caring for dogs, and the Gravettes compensated Chasing Tails very well for providing them with these services. The invoices included in the record show that, over a nine-month period, the Gravettes paid Chasing Tails $7,550 for these services. Additionally, Ms. Hudson testified that her job duties included taking pictures of the dogs for the Chasing Tails Instagram account, which promoted Chasing Tails's business. We, therefore, agree with the trial court's conclusion that the dogs' regular presence at Chasing Tails benefited Chasing Tails and furthered its business. We affirm the trial court's determination that Chasing Tails was an owner of the dogs under Tenn. Code Ann. § 44-8-413.[1]

II.     Whether Chasing Tails's status as an owner of the dogs precludes Ms. Hudson from recovery under the Dog Bite Statute

With Chasing Tails considered an "owner" of the dogs under Tenn. Code Ann. § 44-8-413, we must next consider whether the trial court correctly determined that Ms. Hudson could not recover from the Gravettes under the statute because it was Chasing Tails who had the duty to control the dogs, not the Gravettes.

The language of the statute clearly and unambiguously provides that a dog owner has "a duty to keep [a] dog under reasonable control at all times, and to keep that dog from

---

[1] In her appellate brief, Ms. Hudson argues that the issue of whether Chasing Tails was an owner of the dogs under the statute is not appropriate for summary judgment because "a question of fact still remains regarding whether Chasing Tails was 'temporarily' keeping the Gravettes' dogs." Ms. Hudson admits, however, that the Gravettes frequently boarded the dogs at Chasing Tails. She offers no evidence disputing the Gravettes' evidence showing that the dogs were regularly at Chasing Tails. This argument is unavailing.

running at large," and if the owner breaches that duty, he or she "is subject to civil liability for any damages suffered by a person who is injured by the dog while in a public place or lawfully in or on the private property of another." Tenn. Code Ann. § 44-8-413(a)(1). As discussed above, the statute's definition of "owner" establishes who constitutes an owner with the duty to control a dog. Admittedly, the Gravettes could qualify as owners of the dogs under the statute because, as the legal owners, they too regularly kept and harbored the dogs. The statute, however, notably defines an owner of a dog as someone regularly harboring, keeping, or exercising control over the dog "*at the time of the damage caused to another*." *Id.* (Emphasis added). By the terms of the statute, the issue of statutory liability in this case turns on who, "at the time of the damage caused to another," was in a position to control the dog but failed to do so.

At the time of the alleged attack, Winston and Duke were being boarded at Chasing Tails. The Gravettes were completely separated physically from the dogs, meaning they were not in a position to exercise control of them. The dogs had been in Chasing Tails's sole possession and control for several days. As such, at the time of the damage caused to Ms. Hudson, Chasing Tails was the owner who had the duty to keep the dogs under reasonable control but failed to do so. We, therefore, agree with the trial court's conclusion that Ms. Hudson cannot prove her claim against the Gravettes under Tenn. Code Ann. § 44-8-413 when the Gravettes were not the owners with the duty to keep the dogs under reasonable control at the time of her injuries. We affirm the portion of the trial court's decision granting summary judgment to the Gravettes on Ms. Hudson's claim under Tenn. Code Ann. § 44-8-413.

III.    Whether the statute applying to Chasing Tails abrogated Ms. Hudson's common law claim

Ms. Hudson next contends that the trial court erred in concluding that Chasing Tails's status as an "owner" under Tenn. Code Ann. § 44-8-413 controlled her ability to recover and abrogated consideration of her common law claim against the Gravettes. Under the common law, the general rule for dog bite cases, sometimes referred to as the one-bite rule, provides that "where an animal is accustomed or disposed to injure persons, and the owner or keeper has notice or knowledge of that fact, he is liable for any injury which such animal may do to another person." *Missio v. Williams*, 167 S.W. 473, 474 (Tenn. 1914). In other words, where an owner "knowingly ke[pt] a vicious animal," the common law imposes absolute liability on the owner. *Fletcher v. Richardson*, 603 S.W.2d 734, 735 (Tenn. 1980). This absolute liability arises from "the mere keeping of an animal, after notice of its vicious propensities." *Id.* at 736; *see also Missio*, 167 S.W. at 474. Therefore, if an owner has notice of a dog's vicious habits, the common law imposes liability on the owner even when the dog was "rightfully in the place where the injury [was] inflicted." *Missio*, 167 S.W. at 474.

The Gravettes argue that the trial court correctly determined that, under the circumstances of this case, the dog bite statute abrogated Ms. Hudson's common law claim because the plain language of the statute shows that it altered the common law one-bite rule. When considering whether a statute changes the common law, we apply the rules of statutory construction, which are especially stringent in this context. In particular, "[s]tatutes in derogation of the common law are generally strictly construed" with "a presumption against the legislature's intention to change existing law." *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 599 (Tenn. 1999). Thus, "[w]hile the legislature possesses the plenary power to abrogate the common law by statutory enactment, the existence of a statute in and of itself will not repeal a common law right absent a clear legislative statement expressing an intent to do so." *Cellco P'ship v. Shelby Cnty.*, 172 S.W.3d 574, 591 n.7 (Tenn. Ct. App. 2005) (citing *Lavin v. Jordan*, 16 S.W.3d 362, 368 (Tenn. 2000)). "[W]ithout some clear indication to the contrary, [the court] will not presume that the General Assembly intended to change the common law by implication." *Shore v. Maple Lane Farms, LLC*, 411 S.W.3d 405, 423 (Tenn. 2013); *see also Searcy*, 2017 WL 4743111, at *4. Even if a statute clearly indicates that the General Assembly intended to change the common law, courts do not interpret a statute as changing the common law "any further than the statute declares or necessarily requires." *Shore*, 411 S.W.3d at 423.

Since Tenn. Code Ann. § 44-8-413 was enacted in 2007, only a few cases have analyzed the statute, and none have considered whether a finding that a person other than a dog's legal owner was the owner who violated the duty to keep the dog under reasonable control at all times abrogates any common law claim against the dog's legal owner. In concluding that Ms. Hudson's common law negligence claim against the Gravettes was abrogated by its finding that Chasing Tails was the owner of the dogs that violated the duty to keep them under reasonable control, the trial court relied on this Court's decision in *Searcy v. Axley*. In *Searcy*, a dog bit a child while on the premises of the dog's owners. 2017 WL 4743111, at *1. The child's parents, on behalf of the child, filed suit against the dog's owners asserting a claim under the dog bite statute and a claim for common law negligence "due to [one of the dog's owners] striking and provoking the dog to bite the minor child." *Id.* The trial court granted summary judgment to the dog's owners after concluding that the plaintiffs could not prove an element of the claim they filed pursuant to the dog bite statute, and the court entered a subsequent order dismissing the plaintiffs' common law negligence claim, reasoning that dismissal of the statutory claim required dismissal of the common law negligence claim. *Id.* at *2.

On appeal, the plaintiffs argued that the trial court erred in concluding that the dismissal of their statutory claim required dismissal of their negligence claim. The court began by noting that the residential exception found in Tenn. Code Ann. § 44-8-413(c)(1) applied because the damage caused by the dog occurred on property owned by the dog's owners. *Id.* at *4. That exception, the court explained, "'codifie[d] the common law requirement that a claimant "establish that the dog's owner knew or should have known of

the dog's dangerous propensities."'" *Id.* (quoting *Moore v. Gaut*, No. E2015-00340-COA-R3-CV, 2015 WL 9584389, at *5 (Tenn. Ct. App. Dec. 30, 2015) (quoting Tenn. Code Ann. § 44-8-413(c)(1))). Because the plaintiffs failed to submit sufficient evidence that the owners of the dog "knew or should have known that their dog would have vicious propensities," the court affirmed the trial court's dismissal of the statutory claim. *Id.* at *7.

The *Searcy* court then considered "whether section 44-8-413 abrogates any common law claim that may have existed prior to the statute's enactment in which the claimant in a dog bite case was not required to show that the owner knew or should have known of the dog's dangerous propensities." *Id.* at *5. In examining the statute's language, the court focused on the phrase "any civil action" and concluded that the statute clearly and unambiguously "applies to each and every civil suit falling within the specific category of cases dealt with by section (c)(1)." *Id.* at *6. Thus, the court held, "section (c)(1) of the Dog Bite Statute abrogates common law claims" that "involv[e] damage caused by a dog on its owners' property." *Id.* at *4, *6. Because the plaintiffs alleged that the injury occurred on the dog owners' property, the *Searcy* court concluded that the dog bite statute applied and barred the plaintiffs' common law negligence claim against the dog's owners. *Id.* at *6.

In the present case, Ms. Hudson did not allege that the dogs caused her damages while she was "on residential, farm or other noncommercial property" owned by the Gravettes. Tenn. Code Ann. § 44-8-413(c)(1). She alleged that the dogs caused her damages while she was on Chasing Tails's property. Therefore, subsection (a), not subsection (c), applies to this case. The language of subsection (a) states that, where an owner of a dog breaches the duty to keep the dog under reasonable control, that owner "is subject to civil liability for any damages suffered by a person who is injured by the dog while in a public place or lawfully in or on the private property of another" regardless of whether "the dog's owner knew or should have known of the dog's dangerous propensities." Tenn. Code Ann. § 44-8-413(a). A plain reading of this statutory language shows that the legislature intended to alter the common law one-bite rule by broadening the law to increase accountability for injuries caused by dogs that are not kept under reasonable control. In particular, subsection (a) increases a dog owner's accountability by making him or her liable for injuries caused by his or her dog even in situations where the owner did not know or have reason to know that the dog was vicious. Furthermore, as previously discussed, the statute's definition of "owner" broadened who could be held accountable for injuries caused by a dog not kept under reasonable control.

Nothing in the plain language of the statute, however, shows that the legislature intended to immunize or lessen the liability of owners who know or should know that their dogs have vicious propensities. Therefore, we conclude that where a dog injures a person on the property of someone other than the dog's legal owner, a finding that the legal owner is not subject to liability under the Tenn. Code Ann. § 44-8-413(a) does not abrogate a

claimant's common law negligence claim against the dog's legal owner when the legal owner knew of the dog's vicious propensities.

We note that this holding comports with those from courts in other jurisdictions with strict liability dog bite statutes. *See Priebe v. Nelson*, 140 P.3d 848, 849-50 (Cal. 2006) (holding that a kennel technician had no claim against a dog's owner under California's strict liability dog bite statute but that did not "mark the end of the road for plaintiff" because "[a] common law strict liability cause of action may also be maintained if the [owner of a dog] that bites or injures another person knew or had reason to know of the animal's vicious propensities"); *Armstrong v. Milwaukee Mut. Ins. Co.*, 549 N.W.2d 723, 725-26 (Wis. 1996) (holding that the employee of a boarding facility was an "owner" who could not recover under Wisconsin's strict liability dog bite statute but emphasizing that its holding was limited to cases where "there is no evidence of negligence on the part of the legal owners"); *Murphy v. Buonato*, 679 A.2d 411, 416 (Conn. App. Ct. 1996) (holding that plaintiff who kept a dog while the dog's owner was out of town was a "keeper" that could not recover under Connecticut's strict liability dog bite statute but acknowledging that plaintiff could potentially recover in an "action sounding in negligence"); *Khamis v. Everson*, 623 N.E.2d 683, 686-87 (Ohio Ct. App. 1993) (holding that the employee of a boarding kennel could not sue a dog's owner under Ohio's strict liability dog bite statute but observing that "'keepers' or 'harborers' of dogs that proximately cause injury to them still have a common-law cause of action against the dog's owner"); *Tschida v. Berdusco*, 462 N.W.2d 410, 412 (Minn. Ct. App. 1990) (holding that two people "who both meet the statutory definition of owner" of a dog would not be liable to one another under Minnesota's strict liability dog bite statute but specifying that its holding was limited to cases "where there is no evidence of negligence on the part of the legal owners").

In light of the foregoing, we conclude that the trial court erred in granting summary judgment to the Gravettes as to Ms. Hudson's common law negligence claim. We reverse that portion of the court's decision.

CONCLUSION

The portion of the trial court's judgment granting summary judgment to the Gravettes on Ms. Hudson's claim filed pursuant to Tenn. Code Ann. § 44-8-413 is affirmed. The portion of the trial court's judgment granting summary to the Gravettes on Ms. Hudson's common law claim is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion. Costs of this appeal are assessed equally against the appellant, Rebecca Hudson, and the appellees, Paul Gravette and Leigh Ann Gravette, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

- 11 -